## OMAHA NATIONAL BANK v. D. E. THOMPSON.

### FILED FEBRUARY 7, 1894.   NO. 5142.

1. **Instructions.** Where the principles embodied in instructions asked on behalf of one of the parties to an action have already been stated to the jury by the court, it is not prejudicial error to refuse the reiteration requested.

2. **An instruction** abstractly correct as to propositions of law is properly refused when inapplicable to any state of facts in support of which evidence has been introduced.

3. **Witnesses:** LIMITATION OF CROSS-EXAMINATION. While great latitude must of necessity be given in the cross-examination of witnesses charged with participation in fraudulent transactions which are the subject-matter of the defense pleaded, yet this latitude is subject to limitation in the sound judicial discretion of the trial judge, and unless it is made to appear in this court that such discretion has been exercised to the injury of the complaining party, the judgment will not be reversed merely because of such limitation.

ERROR from the district court of Douglas county.   Tried below before FERGUSON, J.

*Hall, McCulloch & English,* for plaintiff in error.

*John D. Howe* and *Charles O. Whedon, contra.*

RYAN, C.

1. This action was brought in the district court of Douglas county by the defendant in error to recover of the plaintiff in error the value of a certain stock of jewelry, together with the tools, safe, and furniture used in connection therewith, all of which had been previously mortgaged by Edholm & Akin, the owners thereof, to the defendant in error, to secure the payment of upwards of $37,000, evidenced by certain promissory notes of the said mortgagors given to the defendant in error.   This mortgaged property

had been levied upon for the satisfaction of a large claim due from Edholm & Akin to the plaintiff in error, and had been sold for that purpose. No complaint of insufficiency of statement is made as to the petition; hence, its contents need not be given with more particularity than has already been done. There was a verdict upon the issues joined, in favor of the defendant in error, in the sum of $20,000 principal, and $2,041.65 interest due at the time of the trial. There was ample evidence of the value of the property levied upon and sold to now excuse the necessity of an extended examination upon that question; and it is equally without room for question that the notes and mortgage securing the same were duly made to the defendant in error, and that under said mortgage the defendant in error had taken possession of the mortgaged property, and caused his mortgage to be duly filed for record before the levy of which he complains in his petition. As this evidence under the petition was sufficient to entitle the defendant in error to a verdict if no defense was pleaded, it becomes important to consider carefully such matters as were presented by way of defense. The answer began with a denial of each allegation in the petition contained, save and except such as afterwards in said answer should be expressly admitted. The other averments of the answer were as follows:   .

"The defendant says that all of the acts and instruments under which the said D. E. Thompson pretends and claims to have title are made in pursuance of a corrupt and fraudulent conspiracy, contrived, designed, and plotted between the said D. E. Thompson, plaintiff, and the said Nathan J. Edholm and Arthur M. Akin, to cheat and defraud the creditors of said Edholm & Akin, and especially this said defendant, the Omaha National Bank, who was and is a creditor of said Edholm & Akin in a large sum; and this defendant charges the facts to be that prior to the execution of the pretended mortgage or bill of sale pretended to

be made between the said D. E. Thompson and the said
Edholm & Akin, the said D. E. Thompson and the said
Edholm & Akin agreed and conspired together that said
Edholm & Akin should procure goods on credit and
should procure credit at the bank of this defendant and
other banks wherever credit could be obtained, and that
said Edholm & Akin should sell as much of said goods
for cash as could be sold for cash, whether the price should
be sufficient to pay the first cost or otherwise, and that the
said D. E. Thompson should, in such ways as were possi-
ble, aid and abet the said Edholm & Akin in procuring
such goods and in making such sales, and that it was un-
derstood and agreed by and between the said D. E.
Thompson and the said Edholm & Akin that after the
said Edholm & Akin should obtain all the goods that they
could on credit, and all the credit they could at the banks,
that the said Edholm & Akin should fail, and that the
said D. E. Thompson should thereupon receive a mortgage
which should cover everything that the said Edholm &
Akin should have; and that under said mortgage, so con-
trived and plotted to be given, the said D. E. Thompson
should hold the residue of said property, so that the cred-
itors should be deprived of any benefit even of the residue
of said property, and that the said Edholm & Akin and
the said D. E. Thompson should divide the proceeds so
fraudulently obtained by said fraudulent contrivance and
design.   And defendant charges the facts to be that in
pursuance of said conspiracy the said Edholm & Akin, in
conjunction with said D. E. Thompson, and aided and
abetted by the said Thompson, did procure credit from
various firms in large amounts, and from the said Omaha
National Bank, and did, without paying the said creditors,
sell said goods for cash, which cash sales were divided be-
tween the said Edholm & Akin and the said Thompson;
and in pursuance of said corrupt and fraudulent conspiracy
and design contrived as aforesaid by the said Edholm &

Akin and the said Thompson, the said Edholm & Akin
and Thompson having procured all the credit and goods
that their combined efforts could procure, and having sold
all the goods for cash that they could sell, took from the
store of said Edholm & Akin a large quantity of the more
precious goods and gave to the said D. E. Thompson a
pretended mortgage upon the balance, under which pre-
tended mortgage the said Thompson did claim the balance
of said goods, and did claim and withhold from the cred-
itors even the residue, which said goods were such goods as
could not be sold by the said Thompson, Nathan J. Ed-
holm, and Arthur M. Akin for cash; all of which said acts
and doings were in pursuance of said fraudulent and cor-
rupt conspiracy and design plotted and contrived between
the said D. E. Thompson and Edholm & Akin as afore-
said set out.

"And the said D. E. Thompson, under and by means of
this corrupt scheme and design, and by means of various
instruments, including the pretended chattel mortgage
mentioned in the petition herein, has obtained large sums
of money, goods, and credits of the value of thirty thou-
sand dollars ($30,000) or more, arising from the proceeds
of said stock so obtained by said Thompson and Edholm
& Akin, and converted the same to his own use in fraud of
the rights of the creditors aforesaid, and in fraud of the
rights of the Omaha National Bank as a creditor.

"And this defendant charges the facts to be that said
D. E. Thompson paid no consideration whatever for any
of the instruments by which he obtained the said goods
aforesaid, nor did the said D. E. Thompson pay any con-
sideration or advance any money for the said mortgage
under which he claims title to said property; but that all
of the said instruments were obtained by the said D. E.
Thompson in pursuance of said fraudulent conspiracy and
design, and not otherwise; and the said D. E. Thompson
was and is a partner of the said Edholm & Akin in their

said conspiracy and business, and was and is liable to the creditors of the said firm for the debts thereof.

"And this defendant avers that there is now due to this defendant from said firm the sum of $20,000, for which said Edholm & Akin and Thompson are liable to this defendant.

"Wherefore the said defendant prays judgment against the said D. E. Thompson for the sum of twenty thousand dollars ($20,000) and its costs in this behalf most wrongfully sustained."

To the quoted averments of the answer there was a reply in denial, except that the reply admitted the execution of the mortgage to which reference is made in the answer. While the averments of this answer, among other things, charged incidentally that D. E. Thompson paid no consideration for the notes and mortgage made to him, yet this allegation of the want of consideration is coupled with, and dependent upon, the further allegation that the execution of the notes and mortgage was in pursuance of a corrupt conspiracy entered into by said Thompson with the firm of Edholm & Akin. Fairly construed, it follows that there is but one defense aside from the general denial in the introductory part of the answer. This defense is, that the firm of Edholm & Akin entered into a fraudulent and corrupt conspiracy with D. E. Thompson, the object of which was the obtaining of as many goods as possible by Edholm & Akin, the sale of said goods without reference to their cost price, and the participation by Thompson in the proceeds of said sales, and the covering up of the residue, after such sales as were possible had fully been made, by means of the chattel mortgage executed by Edholm & Akin to the said D. E. Thompson. The answer does not charge that the mortgage was made by Edholm & Akin to D. E. Thompson for the sole purpose of hindering, delaying and defrauding the creditors of said Edholm & Akin, and that said Thompson either received said mortgage in

22

furtherance of that intention or with knowledge of the same, actual or implied. The defense was of a conspiracy in which from its inception Thompson was an active participant, and that the mortgage was merely one of the final steps in accomplishing the result attempted by the conspiracy. The district court very liberally construed these averments of the answer however, and allowed the proofs under its averments as though such averments were simply of the ordinary allegations as to a fraudulent conveyance, in respect of which fraudulent intention of the mortgagor the mortgagee had actual or implied notice.

2. The complaints as to the instructions are very numerous and point out in great detail the matters criticised. It would subserve no useful purpose to follow consecutively the comparisons, criticisms, and complaints made by the plaintiff in error in respect to each instruction. It is sufficient to say, in general, that the instructions asked by the plaintiff in error, where not given in the exact language in which they were drawn, were, in effect, given by the judge in the instructions prepared by him. To this proposition there is but one exception, and that is upon the refusal of the court to give the twelfth instruction asked by the plaintiff in error. This instruction was in the following language: "Although the jury may believe from the evidence that there was a good consideration for a portion of the amount mentioned in the mortgage, still if the jury believe from the evidence that there was no consideration for the balance of the amount so mentioned, and that said notes and mortgage were given for a greater amount for the purpose of defrauding, hindering, and delaying the creditors of said mortgagor, then the said mortgage is wholly void and confers no right whatever upon the plaintiff, and your verdict will be for the defendant." This instruction was very properly refused, because there was no evidence whatever from which the jury could find that the notes were given for a less amount than was evidenced by

their terms.   It requires no citation of authorities to estab-
lish what this court has uniformly held, that the refusal to
give an instruction abstractly correct, yet applicable to no
theory sustained by any evidence, is not prejudicial error.

3. In this case the testimony was for the most part di-
rected to the value of the property levied upon and sold
to satisfy the claim of the bank.   In the nature of things
it was very conflicting.   As to some matters, it was utterly
irreconcilable.   Very much might profitably have been
omitted.   None offered, however, was improperly excluded.
Counsel for plaintiff in error insists that the cross-exami-
nation was improperly restricted, and instances the exclu-
sion by the court of the cross-interrogatory propounded to
Edholm, a member of the firm of Edholm & Akin, as to
when he commenced to have business relations with D. E.
Thompson.   After this ruling, counsel asked the same wit-
ness this question: "What were your relations with Mr.
Thompson, the plaintiff in this case?"—and without a
ruling, voluntarily withdrew it before it could be answered.
There is no prejudicial error discovered in this assignment.

Again, counsel for plaintiff in error complains that on
cross-examination he was not permitted to inquire whether
or not Thompson was a partner with Edholm & Akin.
As to whether or not this partnership relation might have
been proved upon direct examination admits of grave
doubt, for in the answer it was only charged that Thomp-
son was a partner in the conspiracy; that is, in effect, a co-
conspirator.   Proof of an agreement to share profits and
losses in a business undertaking, without more, would
hardly be admissible to prove a conspiracy.   Certainly there
was no room for such proof upon cross-examination in this
case.   On his cross-examination Arthur M. Akin, a mem-
ber of the firm of Edholm & Akin, testified that he had
learned the value of a circular counter in controversy by
pricing one like it in Chicago with a dealer in such goods,
and that he knew what this particular counter originally

cost. Counsel complained that thereupon the court did not sustain his motion to strike out all the evidence which had been given by this witness as to the market value of the counter. To have sustained this motion would have withdrawn from the consideration of the jury direct, competent evidence upon this point which was clearly involved in this controversy. The motion, therefore, could not be sustained so far as to reach the evidence given on the direct examination, and it would have been equally anomalous to have sustained it to the extent that this cross-examination should have been excluded upon motion of the attorney who conducted it.

Again, counsel for plaintiff in error contends that it was error to limit Akin's cross-examination to the inquiry whether the said Akin had not told a Mr. Bell that Edholm & Akin were going to sell pianos for Mr. Thompson. As the testimony fully discloses the fact that such an arrangement existed as to business conducted in a room separate from that in which were the mortgaged goods, and without the two lines of business being at all confused or mixed with each other, we cannot conjecture what further inquiry would be profitable which would simply tend to elicit testimony of facts as to which there was no controversy. But counsel persisted in his cross-examination of this witness on this line until it was shown that there was a written contract between Thompson and the firm of Edholm & Akin as to the piano business, and that the witness had shown that written contract to Mr. Bell. No attempt was made to compel the production of this writing, and we think the plaintiff in error has no ground of complaint because of the refusal of the court to admit, even on cross-examination, oral evidence of the agreement shown to be in writing.

Complaint is made that the court did not permit counsel to ask Albert Edholm (who was not a member of the firm of Edholm & Akin) whether the ranch in Wyoming was

put in the name of the witness just before the failure of the firm of Edholm & Akin, and it is insisted that such a line of cross-examination was proper, because the witness had been asked on direct examination whether or not none of the credit of the business that he (witness) was doing was derived from Edholm & Akin.   On his direct examination he had testified that he was engaged in business on his own account.   It was shown that he was never a member of the firm of Edholm & Akin, and he testified that he bought the ranch with his own money, in detail stating from whence it was derived.   The ranch consisted of 160 acres. It is difficult to imagine how any cross-examination could have developed anything of importance, even had the court permitted the cross-examination of Albert Edholm as to whether or not the title to the ranch was put in his name. The court very properly excluded further cross-examination on the line proposed.

The final objection made as to the introduction of testimony is difficult to condense.   Indeed, it is almost as difficult to understand.   It is therefore given by quotation from counsel's brief, in the following language: "So again, Edholm & Akin had told of conversations with Glasburg— conversations under most suspicious circumstances, one of them telling it on reply to a question of Mr. Howe, inserted into our cross-examination, page 780.   They tell their side.   They deny any attempt to induce him.   Yet Glasburg, when he comes on the stand, is not allowed to state his side of those conversations, and when we offer to prove what Edholm & Akin did say in so many words (pages 1228, 1229), an attempt in those very conversations on the part of Arthur Akin and N. J. Edholm to bribe a witness, the court, on the same frivolous objection, says that we have not asked a question which, if asked, would have been leading; refuses our side of this question; protects these parties in the very face of the fact that this offer was before him, and the first question was whether he had had any

such conversations." It is but just to the trial court that
the portion of the record complained of should be set out
with sufficient fullness to vindicate the ruling made, for, in
our view, it can have no other effect. The question pro-
pounded to Glasburg was as follows: "Have you had
any talk or conversation with any one connected with the
opposite side of this case from the bank since this trial be-
gun, with regard to whether or not you were going to tes-
tify in the case?" This was objected to as incompetent,
immaterial, and calling for the witness' conclusion as to
who was connected with the other side of the case. The
objection was sustained, and defendant excepted, whereupon
counsel for plaintiff in error stated: " We will offer to show
by this witness that Nelson J. Edholm and Arthur Akin
came to him." At this point counsel for the other side ob-
jected to the offer on the ground that the law required that,
first, a question should be asked, upon the exclusion of
which counsel might make their offer to prove, but not
having asked any question it was improper to make tender
of proof. This objection was overruled and plaintiff ex-
cepted. The court then said that counsel had the right to
make the offer, and that the court would rule upon the
questions as they arose. Counsel for plaintiff in error then
offered to show that Nelson J. Edholm and Arthur M.
Akin came to the witness and urged upon him that they
were friends of his and that the note which they had here-
tofore refused to give him of $200 they were ready to give
him, which note had already been paid; and also proposed
to pay him some money which they were owing him and
urged upon him not to be a witness in this case, nor to tell
anything he knew; and also that they were to give him a
little house on Twenty-fourth and Lake street, or therea-
bouts, for a nominal price; also, that another party came
to this witness and said to him that he should not testify
against Edholm & Akin, that they were young men and
that he was a young man, and that he should not testify

against them.  Upon inquiry by the court as to what the other side had to say to the offer made, counsel for the other side said: "We have been protesting here, and we now protest, that this witness was not asked any question as to any conversation that he had with Edholm & Akin, and the objection we made to the former question was simply because it was not specific in asking with what party the conversation was had, leaving it for the witness to determine who was connected with the case.  We have not yet made any objection to their asking this witness any question."  At this point counsel for plaintiff in error interrupted, using the following language: "I object to a long-winded statement of this kind.  I have made my offer and they have no right to put a stump speech into this record.  If they want to object to that, and if your honor rules it out, all right.  I object to any stump speech of Mr. Howe being put into this record now."  The court remarked: "I think it is proper for Mr. Howe to put in the record his legal points on which he objects to this evidence, and that is sufficient."

Mr. Hall : " I move to strike out that speech."

Mr. Howe: "I had the floor when I was interrupted."

The Court : "I will strike from the record that statement of Mr. Howe.  The matter stands on the offer of Mr. Hall.  I ask Mr. Howe or Mr. Whedon to state on the record to what point they objected to the offer, their legal objections, and I will pass upon them."

Mr. Howe: "Our sole objection to their making the alleged proof, stated in their last offer, is simply because they have not stated a question asking for any conversation that the witness had with Akin or any other particular party."

The Court : "The objection is sustained."

Mr. Hall : " Give us an exception."

The witness Glasburg was being examined as a witness of plaintiff in error when this colloquy occurred.  The only requirement of the court, precedent to the introduc-

tion of statements of the nature called for by the question, was that the interrogatory should be directed to a conversation with some particular person named; that is, either with Edholm or with Akin, or some other party named. It seems to us that this was but a reasonable requirement, and that counsel, by refusing a compliance therewith, did not place himself in such an attitude as that he could complain of the refusal of the court to permit an answer to an interrogatory so general in its nature as that propounded. If there had been a conversation of the nature of that sought to be elicited, it would be proper that the party with whom that conversation was held should be designated in the interrogatory, so as to afford a fair opportunity to make any proper objection which might lie thereto, because of the incompetency of the evidence founded upon a lack of privity between the plaintiff and the party with whom Glasburg might have had the conversation in question. The requirement was but a reasonable one, and the failure to comply with it affords no ground for criticism of the ruling of the court, much less does it justify any intimation of unfairness on the part of the presiding judge.

The above quotation we will supplement with a few excerpts from the bill of exceptions, illustrative not of any particular question which arose, but of the general course of procedure followed in the trial of this cause. Upon the cross-examination of the witness Akin as to a conversation had with Mr. Bell, to which we have heretofore referred, the witness was asked:

Didn't you tell him substantially just as I have given it to you?

The Court: Can you answer the question, Mr. Witness?

A. Why I can say as to what I told him or said to him.

Q. Well, did you say that to him? If you didn't, you can say so, can't you?

A. I might have told him——

Q. No, no; did you say that?

A. I can't answer that question unless you let me explain.

Mr. O'Connor: We ask that the witness be fined for contempt of court for not answering the question. We ask that the rules be enforced, and that he will have to answer. He can do it. He said so, or he did not say so.

After the refusal of the court to fine for contempt, as requested, the examination proceeded as follows:

Q. At that time didn't you state to Mr. Bell that you had completed this contract with Thompson and that you were to have twenty-five per cent of the profits?

The Court: Answer the question, if you can.

Counsel: Will your honor instruct him to confine his answer and not go outside?

The Court: Yes, I will instruct him to confine his answer; but not as to how he should answer, further than to answer the question as propounded by Mr. Hall.

A. That question I cannot answer unless I am allowed to explain.

Q. Well?

Mr. O'Connor: I expect that is not an answer to the question.

Mr. Howe: Don't you want him to explain?

Mr. Hall: I don't propose to allow him to throw in a lot of stuff unless you will agree that I shall cross-examine on it.

Mr. Howe: We will agree to nothing.

The Court: We will stop right here on this line of questions and go on to something else.

Mr. O'Connor: We take exception to the refusal of the court to compel the witness to answer that question, "yes" or "no."

This objection was overruled, and defendant excepted.

A little further on in the cross-examination of this same witness he was asked upon what book the bills payable and receivable of the firm of Edholm & Akin would be entered, and following this was this colloquy:

A. Why, our eastern notes would be entered on the bills payable books; those are the only ones we kept track of.

Q. Your eastern notes?

A. Yes, sir.

Q. I am not asking you about your eastern notes, I am asking you upon what books those entries would be made. I am not asking you to go into the contents, I am expressly trying to keep you from doing it. I want you now just to answer the question. What is the name of the books upon which your bills payable and receivable would be entered?

A. Our eastern bills payable——

Mr. Hall: Never mind now. What is the name of the book? Don't go and slash that into me any more. You are trained too well. Give the name of the book. You know it.

A. Well, we called it the bills payable and bills receivable book.

The witness Farnsworth was asked as to his judgment of the amount of the stock in January, 1890, and answered that it was about forty thousand as he recollected it.

Mr. O'Connor: I move to strike that out as not responsive to the question, incompetent, irrelevant, and immaterial.

During the argument the following exception was taken:

Mr. O'Connor: They have the witnesses drilled here, and I make the charge deliberately.

Mr. Howe: I want that taken down by the reporter, now that the charge is made deliberately.

The Court: I ask that counsel on both sides abstain from these assertions which have no bearing on the question here.

Mr. O'Connor: The witnesses are trained to that, and I have the right to say so. Just the moment, like a parrot, when a word is mentioned they answer right out what they have no right to answer. I say the witnesses are

trained. While I don't charge Mr. Howe with training them, somebody has done it, and they are very apt scholars.

The Court: I don't think it is proper to say these witnesses are trained. This witness seems to me to be a very fair witness.

Mr. Hall: We desire to except to that.

Mr. O'Connor: I wish to note it down. It is certainly error on the part of the court to remark on any evidence.

In the cross-examination of Albert Edholm was the following:

Q. Didn't you know as a matter of fact that you could get the very best jeweler's trunk for $35?

A. No, sir.

Q. You say that is not so?

A. I say I did not know that.

Q. Oh, you did not know that?

A. You asked me if I did not know that, and I said "no."

Q. Oh, yes; we will give you another chance to dodge it in another direction.

Like the trunk just inquired about, these excerpts are but samples of what occurred during the twenty-five days occupied in the trial of this case; but they serve fully to illustrate with what truth to life was given the examination of one witness in the trial of Bardell against Pickwick, any indorsement of the reflections of the reporter of that case, however, being expressly discarded. The portion of the celebrated trial alluded to is reported in the following language:

"'Now, Mr. Winkle,' said Mr. Skimpin, 'attend to me, if you please, sir, and let me recommend you for your own sake to bear in mind his Lordship's injunction to be careful. I believe you are a particular friend of Pickwick, the defendant, are you not?'

"'I have known Mr. Pickwick now, as well as I remember at this moment, nearly——'

"'Pray, Mr. Winkle, do not evade the question. Are you, or are you not, a particular friend of the defendant?'

"'I was just about to say that——'

"'Will you or will you not answer my question, sir? Come, sir,' said Mr. Skimpin, 'yes or no, if you please.'

"'Yes, I am,' replied Mr. Winkle.

"'Yes, you are, and why could you not say that at once, sir? Perhaps you know the plaintiff, too; Eh, Mr. Winkle?'

"'I don't know her. I have seen her.'

"'Oh, you don't know her, but you have seen her? Now, have the goodness to tell the gentlemen of the jury what you mean by that, Mr. Winkle.'

"'I mean that I am not intimate with her, but I have seen her when I went to call on Mr. Pickwick in Goswell street.'

"'How often have you seen her?'

"'How often?'

"'Yes, Mr. Winkle, how often? I will repeat the question for you a dozen times if you require it, sir.' And the learned gentleman, with a firm and steady frown, placed his hands on his hips and smiled suspiciously at the jury. On this question there arose the edifying browbeating customary on such points. First of all, Mr. Winkle said it was impossible for him to say how many times he had seen Mrs. Bardell. Then he was asked if he had seen her twenty times, to which he replied, 'certainly, more than that.' Then he was asked whether he had not seen her a hundred times; whether he could not swear that he had seen her fifty times; whether he did not know that he had seen her at least seventy-five times, and so forth. The satisfactory conclusion which was arrived at at last, being that he had better take care of himself, and mind what he was about. The witness having been by these means reduced to the requisite ebb of nervous perplexity, the examination was continued as follows:

"'Pray, Mr. Winkle, do you remember calling on the defendant Pickwick at these apartments in the plaintiff's house in Goswell street on one particular morning in the month of July last?'

"'Yes, I do.'

"'Were you accompanied on that occasion by a friend of the name of Tupman, and another of the name of Snodgrass?'

"'Yes, I was.'

"'Are they here?'

"'Yes, they are,' replied Mr. Winkle, looking very earnestly towards the spot where his friends were stationed.

"'Pray, attend to me, Mr. Winkle, and never mind your friends,' said Mr. Skimpin, with another expressive look at the jury. 'They must tell their stories without any previous consultation with you, if none has yet taken place'—(another look at the jury)."

For our purpose this quotation is amply sufficient.  The judgment of the district court is

AFFIRMED.